## Walter *v.* Baldwin, Appellant.

590

Argued April 26, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Clarence T. Bryan* and *T. P. Dunn,* with them *Elmer Evans* and *Paul B. Joslin,* for appellant.

*John A. Spaeder,* of *Marsh, Spaeder, Himebaugh & Baur,* for appellee.

OPINION BY BALDRIGE, J., July 15, 1937:

This is an appeal by defendant from a judgment obtained by the plaintiff for an alleged breach of a written contract.

On December 19, 1928, a written contract was entered into between Oaklawn Memorial Park, a corporation, hereinafter referred to as the cemetery company, party of the first part, J. A. Root and Zella B., his wife, parties of the second part, and G. Daniel Baldwin, party of the third part, whereby the party of the first part agreed to convey to Baldwin, subject to certain mortgages, a tract of land of 153¾ acres, located in the county of Erie, and to grant unto him the right to use its name in advertising lots or parcels of land for sale, and to call the premises "Oaklawn Memorial Park," assigning and transferring unto him all the rights and franchises relative to the premises, together with a stock book and all other books of record pertaining to its affairs. J. A. Root agreed to assign to him 98 shares of the capital stock of the cemetery company and procure an assignment of all the remaining shares with the exception of 3. Root also agreed to act as Baldwin's agent and sell cemetery lots at prices in accordance with a schedule attached to the contract for a term of one year. The money received from sales was to be deposited to the credit of the cemetery company in the Peoples Bank & Trust Company of Erie; 25% thereof was to be paid monthly to Root for his services, 60% to Baldwin, and 15% to be retained by the trust company, or some other bank designated by Baldwin, for perpetual care of the lots. Baldwin agreed to make, execute and deliver good and sufficient deeds or certificates of title to the purchasers of cemetery lots in sections 4, 5, and 18 whenever re-

quested to do so by Root, provided the lots had been paid for.

On September 16, 1929, George R. Walter, by a contract in writing, signed by "Oaklawn Memorial Park Inc., By: J. A. Root," agreed to purchase, for the sum of $2,050, 10 cemetery lots in section 4, on the following terms: $510 payable in cash, and $50 each month until the purchase price was paid. The contract contained a provision that 15% of the sale price received would be set aside by the cemetery company as a perpetual fund, the interest thereon to be used for the upkeep of the cemetery. Attached to this agreement was a writing, termed "Guarantee to Purchaser," signed by "Oaklawn Memorial Park, Inc., J. A. Root, President, M. M. Fuessler, Secretary," wherein it was stated, inter alia, "Oaklawn Memorial Park Association Guarantees that all sections sold in Oaklawn Memorial Park will be improved and beautified for burial purposes and that a perpetual care fund will be created for permanent maintenance;" that it would "Refund to the Original Purchaser at any time within two years from the date hereof, the full amount paid by him or her upon the above sections, together with six per cent (6%) interest per annum, providing that any of the statements and representations herein contained are shown to be untrue."

Plaintiff discontinued making payments after March 15, 1930, as he then learned that the provisions of his contract had been breached. He and others who had entered into agreements to purchase cemetery lots brought an equity suit against Oaklawn Memorial Park, Inc., Root, and Baldwin, praying that the court cancel the agreements, appoint a receiver for the cemetery company, pay back to them the amount due, etc. A judgment pro confesso was entered against Root but the bill as to Baldwin was dismissed by the chancellor on the ground that the plaintiffs had an adequate

remedy at law. Thereupon, this suit was brought to recover the sum of $846, the amount paid.

The plaintiff in his statement of claim alleged that Baldwin, under the assumed name of Oaklawn Memorial Park, Inc., was the undisclosed owner of the cemetery property; that he employed Root as general agent and manager, with full power and authority to employ subagents, enter into contracts and make sales of cemetery lots, collect money, deposit and distribute it, and do any and all other acts necessary for conducting a cemetery business; that Baldwin had full knowledge of and sanctioned the actions of his agent and subagents, including the false and fraudulent representations and warranties they made; that the cemetery had not been improved and beautified, no work having been done toward that end; and that the cemetery had been neglected and abandoned.

The affidavit of defense denied certain of the allegations in the statement of claim, but not specifically those averments in reference to the failure to improve or beautify the cemetery. It was averred therein that plaintiff had constructive notice of the ownership of the property.

A trial was had and a verdict was obtained by the plaintiff; hence this appeal.

In construing a written contract, the effect is to be gathered not solely from the terms of the instrument, but from the real nature and character of the transaction, giving consideration to all the provisions under which the parties contracted, their situation, relations, and any acts indicative of the effect they gave to it: *Brock et al., Exrs., v. Real E. L. T. & T. Co.*, 318 Pa. 49, 55, 56, 178 A. 146. With this rule of construction in mind, we think there is ample evidence to justify the conclusion that it was the intention of the parties that Root, as a general agent on behalf of his undisclosed principal, should have authority to make con-

tracts, supervise the cemetery, make representations regarding the improvements necessary for a cemetery, as well as to do other acts that may be reasonably required to carry out the intent of the parties: Restatement, Agency §51. One would not be expected to buy a burial lot without appropriate development and adequate improvements; authority respecting those matters could fairly be implied. The undisclosed principal was made liable originally because he initiated the transaction; it was his business, conducted under his control, and if there were any profits, they were his.

The general rule is that the scope of an agent's powers depends upon the authority given him. But one dealing with an agent is not always bound by the private instructions given the agent. If he has been held out by the principal as his representative and allowed to exercise enlarged powers from time to time and his acts have been ratified by the principal, the latter is liable: *Himes v. Herr,* 3 Pa. Superior Ct. 124; *Youghiogheny Iron Co. v. Smith,* 66 Pa. 340. This principle is stated in 3 C. J. S., Agency, p. 140, §231, in the following language: "Whether or not a principal is bound by the acts of his agent when dealing with a third person, who does not know the extent of the agent's authority, depends, not so much upon the actual authority given or intended to be given by the principal, as upon the question, what did such third person, dealing with the agent, believe and have a right to believe as to the agent's authority from the acts of the principal." See, also, Williston on Contracts, Vol. I, §281, p. 538; *Hubbard v. Tenbrook & Bro.,* 124 Pa. 291, 16 A. 817; *McCracken v. Hamburger,* 139 Pa. 326, 20 A. 1051.

There was quite a bit of evidence that Baldwin knew of Root's activities and ratified the contracts he made. On February 14, 1930, Baldwin extended the original contract for 7 months, and the following provision was

added: "It is further agreed that no contract entered into between J. A. Root or the Oaklawn Memorial Park and any person or persons not a party to this contract, shall be binding upon G. Daniel Baldwin until approved in writing by said G. Daniel Baldwin." That was the first indication that the contracts Root made should not be binding until expressly approved by Baldwin; there was no express limitation on him in the original contract. According to Root, the contracts signed by Walter and others were in the same form as those used by Oaklawn Memorial Park, Inc., prior to Baldwin's purchase of the property, franchises, etc., of the cemetery company, and Baldwin knew that fact. When the contracts obtained by Root were turned over to Baldwin, he not only failed to repudiate them, but he said he would make all future collections on them, and subsequently sent out notices to those indebted thereunder. Walter testified that in April, 1930, Baldwin told him of his ownership of the property and later demanded the balance of the money due under his contracts; that Baldwin said "he was going to go ahead with it, everything would be all right." This testimony is sufficient to establish a ratification. "Subsequent ratification by a principal of a contract made on his behalf by one who had at the time neither actual nor apparent authority, is as effectual as original authorization:" Williston on Contracts, vol. 1, p. 531, §278. See, also, *Himes v. Herr,* supra.

The appellant claims that Walter had constructive notice of his title, and that he was bound to know he was dealing with an agent and to inquire into the extent of his authority. The recording acts are intended for the protection of grantees: *Piper v. Queeney,* 282 Pa. 135, 143, 127 A. 474. There is no dispute over the title to the land. This was not a conveyance of a fee or interest in the soil itself; it was a mere license or privilege to make interments in the

596

lots purchased, exclusive of others: In re *Kincaid's Appeal*, 66 Pa. 411. The record title of the fee in Baldwin does not affect the right of recovery for an alleged breach of warranties in the contract.

Finally, the appellant takes the position that the present suit is res adjudicata by virtue of the former equity action. That suit was not put in issue in the pleadings, which are assumed to fix the issues (*Pasquinelli v. Southern Macaroni Mfg. Co.*, 272 Pa. 468, 481, 116 A. 372); nor were the proceedings thereof introduced in evidence at the trial. The defendant attempted, under the head of "New Matter," to set up a plea of res adjudicata in his amended affidavit of defense. A rule granted to show cause why the new matter should not be stricken off was made absolute. Consequently, the plea of res adjudicata did not constitute a part of the case under section 16 of the Practice Act of 1915, P. L. 483, as amended by the Act of April 22, 1929, P. L. 627, §4 (12 PS §452; *Ruth-Hastings G. T. Co. v. Slattery*, 266 Pa. 288, 291, 109 A. 695; *Acchione v. Canuso, Sr. et al.*, 101 Pa. Superior Ct. 286, 288); nor could the court take judicial notice of the equity case: *Steel v. Levy*, 282 Pa. 338, 342, 127 A. 766; *Vondersmith v. Urban*, 108 Pa. Superior Ct. 103, 106, 165 A. 62.

After a careful consideration of this case, we have come to the conclusion that no adequate reason has been advanced for disturbing the judgment entered by the learned court below.

Judgment affirmed.