## In re Petition of Chester Monthly Meeting of the Religious Society of Friends et al.

*Alexander B. Geary* of *Geary & Rankin*, for petitioner.

*Edwin A. Howell* and *William Taylor, Jr.*, for respondents.

MacDade, P. J., April 9, 1946.—On November 9, 1945, petitioners aforesaid filed a petition to remove bodies and sell the burial-ground on the westerly side of Edgmont Avenue, between Sixth and Seventh Streets, in the City of Chester, to which a responsive answer has been filed by Caroline Taylor Hughes, William Taylor, Jr., Sallie P. Eyre Price, Caroline Hughes Keene, Elizabeth Upham Davis, John W. Gamble, for themselves and others, relatives of persons buried in said grounds.

Subsequently an appearance was entered by E. A. Howell, Esq., for the following: Isaac A. Pennypacker, Helen Heines Orth, Charles L. Hewes, Mary Louise Trainer Stephenson, Edith V. Eyre, James A. Cochrane, James H. Hughes, Jr., Charles Henry Moon and Walter L. Hewes.

Upon the petition our brother, Sweney, J., granted by decree a hearing, presumably under the Act of June

25, 1913, P. L. 551, sec. 2, 9 PS §48, fixing Friday, December 7, 1945, at 11 a.m., and ordered due advertisement in two newspapers to be made of same once a week for three consecutive weeks. It is further stated in said decree, inter alia:

"And after the removal of said remains of the dead from said burial-ground and the filing of a return by the officers of said petitioner setting forth that said bodies had been removed and interred in another burial-ground and the location thereof to make, execute and deliver to George Beebe, or his assigns, a deed granting and conveying to him the premises upon complying with the terms of a certain agreement."

Petitioners aver, inter alia, that:

1. It is a church or religious corporation, duly incorporated by a decree of this court March 31, 1925, to no. 1790, December term, 1924;

2. It is the owner of the remaining part of an ancient burial-ground situate on the westerly side of Edgmont Avenue in the City of Chester aforesaid, particularly described in the resolution of the board of trustees of petitioners (see Exhibit A attached to said petition);

3. The said graveyard was established by the said religious society, then unincorporated, in the year 1690, when the surrounding land was unimproved;

4. After the incorporation of petitioner the said premises were conveyed by the trustees of the unincorporated society by deed, dated May 27, 1940, and recorded in the office for recording of deeds in and for said county of Delaware in deed book, no. 1110, page 465, etc., the said deed expressly stipulating "to be free and clear of all trusts limitations and reservations, which if any were created at the times of the respective purchases of premises by the action and at the sole suggestion of the purchasers and not of the sellers, and are revocable by said purchasers at any time";

5. The section of the City of Chester in which said burial-ground is now located, for a number of years has been and now is closely built with business houses and by reason of the growth of said City of Chester and the section thereof wherein said graveyard is located, it is deemed necessary and desirable in the opinion of the members of petitioner to remove the bodies from said graveyard to another suitable graveyard or cemetery. Further, the remains of bodies interred in said graveyard interfere with and hinder improvements, extensions and general progressive interests of the said City of Chester;

6. By decree entered on January 10, 1941, the court authorized the removal of the bodies from a lot of land then a part of said graveyard and the leasing of that lot for mercantile purposes. That lot has been sold and a large mercantile store erected thereon;

7. No interments have been made in said graveyard for many years and it has been known that the sale of the remaining part of the graveyard would be made and there have been no objections from any of the families interested in the graves in said graveyard;

8. No lots were ever sold out of said graveyard for burial purposes;

9. Your petitioner had bids for the remaining part of said graveyard and at a regular meeting of the said Chester Monthly Meeting of the Religious Society of Friends, held in the meeting house of said society, and the usual place of meeting of the members of said society, on September 13, 1945, a resolution was unanimously adopted authorizing the trustees to sell said burial-ground, subject to court proceedings, and the board of trustees on October 31, 1945, at a monthly meeting unanimously resolved that the said graveyard be sold to George Beebe for the sum of $156,600, upon the terms particularly set forth in said agreement and the addenda thereto, he being the highest and best bid-

der and that being the highest bid for the same (see Exhibit B attached to said petition) ;

10. The sale to the said George Beebe is conditioned on petitioner removing the bodies from said graveyard;

11. The remains of said bodies will be reinterred in a suitable graveyard or cemetery in the vicinity of the said City of Chester; and

12. The sum of $156,600 for said graveyard is a full and fair price, and more than the same would bring at public sale.

To this petition, the averments of which are substantially as immediately before stated, the answer avers, inter alia, that:

1. The respondents are relatives and descendants of various persons buried in the said Friends' burial-ground;

2. Petitioner, the Chester Monthly Meeting of the Religious Society of Friends, is the record owner of the land therein described; but aver that the title is in them only, not in fee but as trustees under the following provisos, conditions and restrictions and to no other use, intent or purpose whatsoever, that is to say, "for the use, benefit and behoof of the said people called Quakers for a place to bury their dead". Said title arising under and by virtue of a declaration of trust executed by John Sharpless, and others, on June 9, 1758, and recorded in the office of the recorder of deeds in and for Chester County, Pa., in deed book L, vol. 11, page 97, which was executed simultaneously with and in consideration of the deed under which title came from John Smith and James Lownes to the said John Sharpless and others, recorded in the office aforesaid in deed book L, vol. 11, page 95, under which deed and declaration of trust title vested in the said trustees subject to the said trust;

3. It is admitted that a deed of the nature and kind set forth in paragraph 4 was executed. It is denied that the said deed could modify, change or affect title to

the said land in any particular; and the said burial-ground having been continuously used and occupied for 250 years and more as a burial-ground, that the ground remains subject to the said uses, purposes and trusts notwithstanding the said deed. It is denied that the grantors in the said deed had the right, authority or title to convey the said land except under and subject to the trusts, uses and purposes aforesaid;

4. It is admitted also that the section in the City of Chester in which the said burial-ground is now located is closely built with business houses. It is averred that it has been so built for a period of over 50 years and that conditions have not changed within the last 50 years as to the growth of the City of Chester in the vicinity and for many years before that. It is denied that it is necessary and desirable to remove the bodies from the said graveyard for any cause whatsoever. It is denied that the remains of bodies interred in the graveyard interfere with and hinder improvements, extensions or general progressive interests of the City of Chester;

5. It is denied that by decree at any time the Court of Quarter Sessions of the Peace of Delaware County authorized the removal of bodies from the said burial-ground; however, it is admitted that, on January 10, 1941, this court, by Fronefield, P. J., permitted the removal of some of the bodies from one section of the said burial-ground or graveyard to another section thereof. It is averred that all of the said bodies are still interred in the said burial-ground;

6. It is denied that no interments have been made in the said graveyard for many years. It is denied that the proposed sale of all of the remainder of the graveyard was made known to all of the relatives and descendants of persons buried there. It is denied that notices were sent or that any effort was made to notify the persons whose relatives and ancestors are buried there. It is denied that no objections have been made

by any of the families interested in the graves of the said yard. On the contrary it is averred that the respondents making the answer and many others were unfamiliar with and uninformed of the said plans; and they and many others had no opportunity to express their wishes in the matter. It is averred that all of the respondents and many others are opposed to the removal of the bodies from the said burial-ground and the sale of the land as proposed in said petition;

7. It is averred that certain lots and sections were laid out for use of certain families and have been so held from time immemorial;

8. It is further averred that, without the approval and consent of this court, such proceedings are irrelevant and immaterial, respecting the negotiations for a sale of the burial-ground and it is averred that the said agreement of sale is conditioned upon the approval by this court of this petition;

9. And further it is denied that the petition sets forth any provision for a suitable graveyard or cemetery in the vicinity of the City of Chester. It is denied that the petition shows any permission, authority or right to inter said bodies in any graveyard or cemetery anywhere. It is denied that a suitable graveyard or cemetery has been provided by petitioners or by anyone else;

10. And further answering the said petition respondents aver that there are in the said ancient burying ground interred the remains of many distinguished nationally known people, to wit, David Lloyd, first chief justice of the State of Pennsylvania; Henry H. Graham, leading lawyer and legislator; John Salkeld, one of the original land-owners of the City of Chester; and many of the ancestors of many residents of the City of Chester, including ancestors and relatives of all of the signers to this answer, and friends and relatives thereof, including the ancestors of Major General William G. Price, Jr., veteran of the Spanish-American

War, Mexican Border and the first World War, and they believe that the burial-ground should be preserved as a shrine and as one of the foremost historic spots of the City of Chester;

11. The funds provided by the lease or sale of the first portion of the cemetery over and above the amount expended in the removal of the bodies would, if properly handled and used for the purpose, maintain the said burial-ground as a historic spot without burden to the petitioners or to any other person;

12. It is not only the privilege but the duty of the trustees of the said burial-ground to maintain the same in proper order and condition having due regard to the trust imposed upon them and the character of the use of the said burial-ground for over 250 years. The invested funds of the trustees derived from the lease or sale of portion of the grounds would be ample to maintain the burial-ground in proper condition without subletting any part of it as a parking lot or for any other purpose, so as to preserve the said grounds with due and proper respect to the ancestors of both the petitioners and the respondents;

13. If the said burial-ground has in any way become a public nuisance it is due to the fault and neglect of the petitioners or of the trustees of the said burial-ground, who have ample funds for the purposes of maintaining and caring therefor;

14. There is no imperative or impelling necessity for removal of the said bodies. It would be to the harm, injury and damage and unnecessary interference with the last resting place of the said bodies. The removal of the said bodies would be against the wishes and desires and best interests of many of the relatives of those buried there;

15. The disturbance of the said bodies and their removal and the abandonment of the said grounds as a place of sepulchre would be contrary to the laws of the Commonwealth of Pennsylvania and no proper facts

have been alleged or proven giving this court jurisdiction of the matter, and this court has no jurisdiction in the matter;

16. The petition does not comply with the terms of the Act of June 25, 1913, P. L. 551, sec. 2, under which they are presumed to be acting in the following particulars:

(a) There is no allegation that for sanitary purposes any removal of the bodies was necessary or desirable; and under the terms of the act such conditions must not only be alleged but proven.

(b) There is no allegation of any condition existing authorizing the action of the court or giving the said court jurisdiction under the terms of the statutes of Pennsylvania.

(c) It is denied that the said burial-ground is objectionable for sanitary purposes; that it has interfered in any way with the growth of the City of Chester; that interment of the dead has been or may be prohibited; that the said burial-ground has ceased to be used for interments. That it has been neglected so as to become a public nuisance; or that the remains of bodies interred therein interfere and hinder the improvements, extensions or general progressive interests of the city; and that it would be for the best interests of the persons there interred for their removal.

Concluding their answer respondents pray to permit others, such as friends, relatives or descendants of any persons buried in the said burial-ground to intervene by entering their appearances, etc., and that the petition be dismissed at the costs of petitioner.

The petition of the clerk of the Concord Quarterly Meeting avers that it is the superior meeting of which petitioner is a constituent part and subordinated thereto; that it has a contingent legal interest in all property owned by its constituent meetings, and prayed that the disposition of this petition be deferred until the quarterly meeting, to be held January 26, 1946, etc.

Nothing has been done in pursuance to such request to our knowledge.

Also, a petition of some merchants of the City of Chester, having stores in the immediate vicinity of the burial ground in question, stating inter alia that its maintenance hinders improvements, extensions and the general progressive interests of the City of Chester. It was allowed to be filed but is not considered evidential, nor given consideration in this decision. Petitioners should appear in court when they could be cross-examined.

From the Swarthmore College Historical Library we have before us a list of burials of Chester Pennsylvania Monthly Meeting. We directed that it be filed although we cannot consider it because the places of burial are not specified, even if evidential otherwise. It may be of great historical value and for that reason only it is permitted to be filed.

After several continuances the matter came on for several hearings, when considerable testimony was adduced pro and con, following which instructions were given to respective counsel to present their requests for findings of fact and conclusions of law and briefs as soon as could conveniently be done after the transcription and the filing of said testimony. Most recently such were handed to the chancellor together with the record and we now proceed to make our determination.

### Questions involved

1. May the bodies be removed from the graveyard over the objection of the relatives of such decedents?

2. Is the Chester Monthly Meeting of the Religious Society of Friends, a corporation, the legal owner of the said fee?

3. Were the proceedings for leave to transfer some of the bodies from one part of the graveyard to another (January 10, 1941, Misc. Docket Z-114) in compliance with the law?

## Discussion

After having carefully examined the record heretofore elaborated upon the issues, and made our findings, we can see no useful purpose to encumber the record further by repeating it in digest form. As usual there is a conflict of opinions and always will be, when a petition to sell an ancient historical burying-ground, and to remove the bodies therefrom, is filed.

Considerable opposition is made to the granting of this petition under all the circumstances by not only the relatives and descendants of the deceased persons interred there, but is has aroused the ire of public opinion, growing out of a feeling that, if the court permits the sale of the burying-ground and the removal of the bodies elsewhere, some of whom have been pioneers in our colonial period, and buried in a town where Penn's great laws were passed by the assembly, it would be to coin money out of the bones of the dead and violate the right of sepulchre, contrary to the instincts of the race and the keenest sensibilities of the heart—thus to desecrate scores of graves.

This case will be decided upon the law and the evidence, but yet we must bear in mind that there are golden strings of what we call decency and humanity running through the fabric of human instincts. In such thought we are not alone for in substance did Mr. Chief Justice Agnew so express himself in Craig v. First Presbyterian Church, 88 Pa. 42, which is authority for the proposition that the Commonwealth or municipality has a right to take burial-grounds under certain conditions, but it is entirely a different question when the removal is for individual or private interest, as herein, for the Chester meeting's interests are individual and not public. That case is very different from the instant case for it did not involve an entire abandonment of a burial-ground and was only the sole question of removal from a portion to make room for church purposes.

Again, to revert to the public interest in the instant case, because of its historical associations and traditions, and the many distinguished citizens of the city and county, some of State-wide and National reputation, buried there, it is opposed by many citizens of Delaware County and Chester City, not having relations there.

Perhaps the most distinguished of these was David Lloyd.

"William Penn was the greatest man in the pre-revolutionary history of Pennsylvania, but David Lloyd was a close second", was the conviction of Burton Alvan Konkle, Philadelphia historian, in newspaper articles, "Men and Things" column, in the Philadelphia Evening Bulletin.

Continuing the quotation, "David Lloyd was really William Penn's representative in what is now Pennsylvania and Delaware. . . . After the death of the first Chief Justice of Pennsylvania, Penn appointed one of his lawyers, David Lloyd, who wrote nearly all of the laws of the colony from the outset of the eighteenth century until his death which occurred in 1731".

Another historian says:

"Liberal government in Pennsylvania owes more than to any other man among our early law givers, unless we except Penn himself, to David Lloyd". That was the judgment of former judge, governor and historian, Samuel W. Pennypacker, in Pennsylvania Magazine, volume 9, page 116, 1885.

Other distinguished men buried there are Caleb Copeland or Cowpland, Esq., early lawyer; Henry Hale Graham, one of the earliest lawyers; John Salkeld, one of the earliest land owners in Chester and distinguished in ancient history; Gideon Jacques, physician, and his wife; Joshua Owens, an early physician, and his wife; and the ancestors of many prominent residents of Chester, including Major General William G. Price, Jr., of World War I, who together with his wife appeared

as witnesses, strenuously opposed to the granting of the petition and the removal of the bodies of their ancestors lying there in peaceful slumber and forever at rest.

It was stated in court, although there is no evidence to confirm it, that a committee of citizens had been appointed to provide a proper resting place and memorial for David Lloyd and his wife. This committee has not functioned. No such provision has been made according to any evidence produced; and it is suggested that the proper place for such a memorial would be in their last resting place and that their ashes should not be dishonored by removal from the city where they lived and died, and there they have been for over 200 years.

The interest of the public at large is very evident from the testimony of Albert Cook Myers, of Moylan, member of Providence meeting; devoting his time very largely to historical matters; one time president of Pennsylvania Federation of Historical Society, of 1300 Locust Street, Philadelphia, secretary of Valley Forge Park Commission and chairman of its historical committee for 13 years.

Mr. Myers is one who knows historical values and who appreciates the importance of such things. The photographs of the headstones of David Lloyd and his wife, which he took while in England from a photograph treasured there, shows what other people think. His testimony was emphatic that this was one of the four historical spots of Chester and should be cherished as such.

Such removal is opposed by relatives of most of the families buried there. Relatives of three Bevans, two Engles, eleven Eyres, eleven Fairlambs, five Flowers, two Grays, three Hewes, Gideon Jacques and wife, seven Kerlins, two Lanes, Joshua Owens, the eight Pennells, two Prices, three Rulons, Shoemaker, Trainers, Sharplesses, Neidy, Evans, Higgins, Dicks, Mills, and

Dyers among others are protesting, practically representatives of every family there, all of whom have either appeared in court to testify or entered their appearance as objecting.

The objection of one relative is of more importance than the consent of many.

In other words, unless the petition and evidence bring the matter within the statutory requirements the objection of a single relative would control. Here the protest is overwhelming and emphatic.

Although counsel for petitioners stated at bar that they had no record of the burials in the burial-ground, respondents produced an itemized list of all the stones, with inscriptions and dates, and a plan (indexed to the list) prepared by Melvin I. Minshall, an entirely disinterested witness, who obtained the information at a considerable expense of time solely because of his interest in the historical nature of the burial-ground.

The testimony of Mr. Myers was to the effect that there was of record a minute of the Chester meeting authorizing the purchase of the burial-ground in 1702, and a provision in the bylaws of the meeting as to its care, custody, etc., and establishing it in 1703.

Now that we have established the factual situation quite clearly, what is the applicable law pertaining to burial-grounds? It is conceded at common law and the law of this Commonwealth, that burial-grounds cannot be sold, except as provided by statute: Brown v. Lutheran Church, 23 Pa. 495; Gumbert's Appeal, 110 Pa. 496-502.

In this case land granted to a church for a churchyard and burial-place was abandoned as a church, but it was still used for burial. It was held that the relatives of those buried there and the original grantors were the only parties interested. In this case an attempted sale was set aside on the petition of former members of the congregation and those who had relatives buried in the churchyard, and a deed already

executed was ordered surrendered. This was the law, unless changed by statute: Chew v. Presbyterian Church, 237 Fed. 219, and Mt. Calvary M. P. Church, 272 Pa. 453.

Gumbert's Appeal, supra, was cited with approval and it was directly held that "Except as provided by statute, land dedicated for and used as a burying-ground cannot be sold": Jessop's Petition, 9 D. & C. 292.

The latter case arose under the Act of 1913 and its amendments of 1921. At page 295, the court said:

"Except as provided by statute, land dedicated for and used as a burying-ground cannot be sold: Brown v. Lutheran Church, 23 Pa. 495; Gumbert's Appeal, 110 Pa. 496; Chew v. First Presbyterian Church, 237 Fed. Repr. 219." The yearly meeting attempted to do the same thing as in the case at bar. The petition was refused at the instance of relatives. It was held that relatives have a right to object and it cannot be done against their opposition. Abandonment was claimed but there was no proof of abandonment.

This has been the state of the law unless it has been changed by statute. There is no question whatever of the right of the legislature to control the use of lands in the State no matter what restrictions, attainder or qualifications. But the fact that the legislature has acted must appear; and when common-law rights are interfered with, it must clearly appear in the case at issue. In this case it fails.

Petitioners in their petition refrained from referring to any statute under which the court would be authorized to act. However in its brief, we are advised that the proceeding is under the Act of 1913.

We now refer to the acts having any bearing on burial grants.

First, the Act of April 18, 1877, P. L. 54, 9 PS §41, where, under certain conditions only, unnecessary to

detail, if the petition sets forth and the proofs show "that the erection, . . . or improvement of building for religious purposes . . . are hampered and interfered with, and the welfare of such religious society . . . is injured to the detriment thereof" the court may direct the removal of the remains from "so much of such burial ground as may be needed for buildings for religious purposes only" by the society.

This of course is not the situation here and no claim is made that it is.

The second statute is the Act of May 12, 1887, P. L. 96, sec. 1, 9 PS §43, where the causes for removal are: "has ceased to be used for interments or has become so neglected, as in the opinion of the court, to become a public nuisance, or that the remains of bodies interred in any such neglected or disused cemetery in any city or borough interfere with and hinder the improvements, extensions, and general progressive interests of any city or borough; or when the said land shall be desired by the said municipality, or in the school district thereof, for the erection thereon of any municipal school, or free public library building, or for use as recreation centers or municipal playgrounds, or the opening, laying out, or extension through said land of any street or highway, or for any other public purposes."

It is to be noted that this act controls only where a public purpose requires the abandonment of the burial-ground, and the land where it is situated.

No such need exists, none is claimed in the instant case, and the petition is not filed under that act.

The only other act is the Act of June 25, 1913, P. L. 551, 9 PS §48, and it is to be presumed that this is the act under which petitioners are proceeding. There are five conditions under which this act is effective. Petitioners have shown no conditions complying with any one of them. They are as follows:

First: "by reason of the growth thereof," (the municipality) "as well as for sanitary purposes, it is deemed necessary or desirable, in the opinion of the said church . . . to change the location."

The evidence shows and the answer sets forth that there has been no growth of the city in the vicinity for 50 years. There is absolute lack of any evidence of "sanitary purposes". None are alleged or proven. Both conditions must exist, or the act does not apply.

Neither does the second: "by reason of the opening of streets . . . through or around same, a portion of the property has become angular."

No streets are proposed to be opened nor need be. No change has occurred by street openings in this property for over 50 years. No change has occurred by reason of improvements or changes in the surroundings.

Third: "the interment of the dead may, in the interest of public health, be prohibited."

This is denied by the answer and no evidence offered in support thereof.

Fourth: "has ceased to be used for interments, and has become so neglected as to become a public nuisance."

While the evidence is that the last interment was as recent as 1929 and there is no evidence of any interment since that time, there is nothing to prevent interment at the present time; neither ordinance, law, or the action of any body.

That the ground has been neglected will be discussed later. There is no evidence whatever that the old historic burial-ground has become "a public nuisance".

Unless it has, this section does not apply.

Fifth: "or that the remains of bodies interred in any such neglected or disused cemetery, . . . interfere with and hinder the improvements, extension and general progressive interest of any city.

There is no proof whatever that any interests of the municipality require the abandonment of the burial-ground.

Unless some one of these conditions is alleged and proven, the act is ineffective in this case, and there is no other statutory authority whatever.

Since none of the conditions under which the statutes authorize the court to act has been proven (and the proof goes directly to the contrary) the petition should be dismissed.

The petition, so-called, does not set forth any jurisdictional facts under the statute. It does set forth neglect on the part of the custodians of the burial-ground.

The main point raised by petitioners is that the burial-ground has been neglected. This point is raised by the very ones whose duty it is to care for it and provide for its proper care and maintenance, and they are seeking to take advantage of their own neglect. The petitioners are the Chester Monthly Meeting of the Religious Society of Friends, by Charles Palmer, president, and Newlin P. Palmer, secretary. Charles Palmer was also the treasurer and a member of the board of trustees of this ground.

That this neglect is not due to financial inability appears very plainly from the evidence produced on the demand of respondents.

The evidence is that they have a fund of $75,000 received December 17, 1941, from the sale of part of the lot out of which they paid Charles Palmer, who was president of the meeting, a trustee for the cemetery grounds, and its treasurer, a commission of $3,750; and paid the undertaker for removal of the bodies from one portion of the burial-ground to another, $3,000, in addition to other payments; made certain charitable contributions and invested the balance, excepting about $1,000, which they carry in cash.

That they have added to this principal fund from time to time from its income and rentals of the ground

so that at the present time they have a fund of $69,746
with previous investments of the graveyard funds, in-
cluding trust funds amounting to $1,070.

Income: They have since December of 1940 received
rentals aggregating $7,856.71 from this burial-ground.
Of this they used $3,438.60 for expenses connected with
the burial-ground, including part payment for the re-
moval of the bodies from the small section sold, aggre-
gating $3,171; in addition to what they charged out of
principal mentioned above.

For maintenance during the five years they have
expended $169.28 in the care of the graveyard; and
the balance they either appropriated for the general
uses of the Chester meeting, or contributed to the main-
tenance of "conscientious objectors" and some chari-
ties; and 10 percent of all income was set aside for
additional principal.

These figures are interesting as showing that it could
not have been lack of funds that caused the neglect.

The meeting and the trustees of the meeting were
trustees for the proper care and maintenance of the
burial-ground and their duty was to properly care for
and maintain it. The admitted condition of the ground
with fallen stones, sunken graves, overgrown with
weeds and many other evidences of neglect, shows con-
clusively neglect in the trust for which the meeting
and the trustees are directly responsible.

"All proceeds derived by a nonprofit corporation
from any loan, sale, lease, ground rent or mortgage
shall be faithfully and specifically used for or applied
to the lawful activities of the corporation, and in case
such proceeds are derived from any real estate subject
to a trust, the trust shall be impinged upon such pro-
ceeds": Act of May 5, 1933, P. L. 289, art. 3, sec. 308,
15 PS §2851-308.

Also, . . . "shall set aside annually a sum equal to
at least one-tenth of the gross amount of the funds

arising from the sale of lots . . . for the perpetual care and preservation of the grounds and the repair and renewal of the buildings and property connected with and forming a part of the burial ground or cemetery": Act of May 5, 1933, P. L. 289, art. 3, sec. 315-A, 15 PS §2851-315.

Relative to the record title vested by deed dated the 24th day of "the third month called May" 1712 (old style) in Nicholas Fairlamb, John Sharpless, John Smith, Thomas Vernon, James Lounes and Joseph Vernon, which was possibly the origin of the record title to the burial-ground, the minutes of the meeting show (the burial-ground was first authorized in 1702 and its maintenance mentioned in 1703) there may have been an earlier deed of which at present there is no record. The conveyance mentioned in the petition was a mere continuance of the chain of title and not the original. On June 6, 1758, the said John Smith and James Lounes as sole survivors, conveyed the land to John Sharpless, Joseph Hoskins, Daniel Sharpless, Samuel Howell, William Swaffer and Nathaniel Squibb, who immediately executed their declaration of trust that they held the same "by the special nomination and appointment of the members of the Preparative Meeting of the People called Quakers at Chester aforesaid" and that the said recited indenture "was made or intended, to us in trust to the intent only that we or such or so many of us as shall be and continue in unity and religious fellowship with the said people called Quakers and remain members of the Monthly Meeting of Chester held at Providence whereunto we now do belong should stand and be seized of the said piece or parcel of ground to no other use, intent and purpose whatsoever, that is to say to and for the use, benefit and behoof of the said people called Quakers for a place to bury their dead" and authorizing the members of the preparative meeting at Chester aforesaid as occasion may require to

select other trustees and declaring that they held it solely for the purposes and to the uses mentioned.

This clearly establishes a trust and for the sole purpose of a burial-ground for Quakers.

It is probable, and we are not deciding here:

1. That the title is not in the Chester preparative meeting, but in trustees.

2. That the only authority or right the Friends meeting have as to the land is to appoint trustees.

3. That they have no right to convey any part thereof or to permit the use of any part thereof except for the purposes named, the burial-ground.

4. That the attempted conveyancing recited in paragraph 4 of the petition was invalid and void.

On the subject of abandonment, which was alluded to at the trial, it is not contended by the petitioners that the cemetery has been abandoned. As long as it appears to be used for the purpose of a burial-ground, that is to say, as long as it shows evidences of graves, stones, monuments, etc., and is known or recognized by the public as a graveyard, it is not abandoned: 5 R. C. L. 242.

It must be so treated and neglected as to lose its identity as a graveyard to be considered as abandoned: Campbell et al. v. City of Kansas, 102 Mo. 326, 13 SW 897.

From a perusal of petitioner's brief, we assume that it relies principally for a decision in its favor upon Kincaid's Appeal, 66 Pa. 411.

A perusal of that case does not convince us it is controlling in the instant case, for that case was based upon a special act of the legislature, applying to a particular cemetery. The act relied upon was the Act of April 13, 1867, P. L. 1234, barring interments therein and providing for the removal of the bodies. The discussion in it is based entirely on the terms of that act and the authority of the legislature as to the controlling of that particular burial-ground. Such is not the case

at bar. There is no public action required of any kind, much less the authority of the legislature to pass on this particular ground. There was a discussion in that case as to the rights of lot holders who had bought and paid for the lots and the decision is entirely based on the peculiar provisions and circumstances of that act. Of course, the State can condemn, in either case, and that is all that case decides.

In Brnilovich v. St. George Church, 326 Pa. 218, is discussed the power of a religious association to limit burials under the peculiar facts of that case. It has nothing to do with the removal of bodies or the abandonment of a cemetery. The case simply holds that a religious association maintaining a cemetery may limit the privilege of burial to its own members and exclude all others.

Craig v. First Presbyterian Church, 88 Pa. 42, was a proceeding under the Act of 1877. The question was the right of a church, owning a burial-ground, to remove graves from one portion of it, for an extension of the church and Sunday school, to another portion. The question was whether certain technicalities in the act had been complied with. It clearly differs from the case at bar in that it did not involve an entire abandonment of a burial-ground; and, second, that it was the mere question of removal from a portion, for church purposes; a question that would seem to be directly under the control of the church organization. Craig, one of the petitioners, had no bodies buried there. In considering this case the dissenting opinion of Chief Justice Agnew (pp. 53-54) is interesting. He admits the right of the Commonwealth or municipality to take burial-grounds under certain conditions.

"But I deny the right of removal for individual or private interests . . . A religious congregation is a private body, and its interests are individual, not public. Thus to coin money out of the bones of the dead, is to violate a purchaser's right of sepulture, contrary to

the instincts of the race and the keenest sensibilities of the heart . . . And are we now to say that the desecration of scores of graves to save money to a congregation is according to law."

All of the cases cited by petitioner in its brief appear to be interesting but inapplicable to the instant case. Hence, the prayer of petitioner must be refused and the petition dismissed.

### Addendum

1. Disinterments:

The word "may" in the Act of May 12, 1887, P. L. 96, 9 PS §43, for the removal of the dead from burying-grounds, should not be read "shall"; a discretion is vested in the court: Zion's German Reformed Congregation's Appeal, 1 Monaghan 635.

2. The purchaser of land upon which is located a burial-ground may be enjoined from removing the bodies therefrom, *if he attempts to do so against the wishes of those interested.* Every interment is a concession of a privilege which cannot afterwards be repudiated; and the purchaser's title to the ground is fettered with the right of burial: First Presbyterian Church v. Second Presbyterian Church, 2 Brewster 372.

3. The removal of the remains of persons interred in a burial-ground without the consent of their families will be enjoined at the suit of such families as have the right to inter in said ground: First Presbyterian Church, etc., supra.

4. In the case as it has been presented to us, there is no question of public necessity to be considered, inasmuch as it is not proposed to take this ground for public use; nor do any considerations affecting the welfare of the living arise. This burial-ground, although in a neglected condition, has not been presented as a nuisance, nor is it in any degree injurious to the health of the neighborhood.

5. The persons interested in land devised to religious societies for a place of burial are the relatives of those buried therein, and after the dissolution of the societies such interest remains and they may have themselves and others incorporated to better preserve the use: Appeal of Gumbert, 110 Pa. 496.

6. "The burial places and remains of the departed have ever been sacred in human history. The policy of our laws, statutory and unwritten, protects their sleeping places. There has been no change in these human sentiments of reverence and regard for the sacred dust of the dead since the time 'When feelings were young and the world was new.'

"To cast so much as dust upon the remains of the dead has been a sacred office from the burial of Abel to the mariner who talked with the ghost of Archytas, and from then till now. The living have desired 'beauty for ashes', and in their lifetime taken infinite pains to secure an undisturbed repose in death.

"Shakespeare's bones would long ago have been enshrined in Westminster Abbey but for this epitaph:

" 'Good Friend for Jesus' sake forbear
To digge Y-e dvst Enclosed H E R E
Blessed be Y-e Man Y-t spares T-Hs Stones
And cvrst be He Y-t moves my bones.'

"The history of mortuary customs from the earliest times confirms the husband's right of sepulture. Abraham was none too faithful a husband to Sarah, for he twice said, for fear of Pharaoh and Abimelech, 'She is my sister,' and resigned her thus to the embraces of other men, but we are not told that his next of kin adduced this as a reason for intrusion upon his right of burial. The purchase of the field of Ephron for a private cemetery is the first recorded mercantile transaction; as touching a story for the sentimentalist and as interesting to the economist. There Abraham buried Sarah, his wife; there Isaac buried Rebekah, his wife,

there Jacob buried Leah. It was Jacob, and not the children of Laban, who set the pillar upon the grave of Rachel; 'that' says the sacred historian, 'is the pillar of Rachel's grave unto this day,' and six centuries later her sepulchre was still preserved. I Sam. x, 2. And so have men continued to bury their wives and to be buried with them ever since. So that the memory of man 'runneth not to the contrary' of such a custom. Few, if any, have been those who dared to assert a right in opposition to it; to the credit of human nature, 'for sorrows humanize our race'; and so husband and wife, with rare exception, have been laid beside each other 'in mother earth's cold, silent bosom,' and it has been thus that those who were 'lovely and pleasant in their lives,' in death 'were not divided.' . . . Unto this day every instinct of humanity, every sentiment of religion and decency, suggest that it should be Jacob's pillar, and not another's, upon the grave of every Rachel."

7. "The ancient Greeks and Romans were particular to carry out the directions of the deceased respecting the disposition of his body. Democritus wished to be embalmed in honey, and it was done. Thucydides says that the bones of Themistocles, by his own command, were privately carried back from Magnesia to Attica, and buried there; and Plutarch tells us that at the request of Lycurgus, his ashes were thrown into the sea. A similar story is related of Solon by Diogenes Laertius. Demosthenes (Timocr.) recites Solon's funeral law as follows: 'Let the dead bodies be laid out in a house according as the deceased gave orders,' etc. The body of Muna was not burned, as was the usual custom, because he himself forbade it, as Plutarch relates. In modern times universal regard has been paid to these mortuary bequests, though some of them have been whimsical enough, the most noted perhaps being the well-known disposition of his body by Jeremy Bentham as a dried specimen in a medical college."

8. "Weeds upon a grave, neglect of the spot of burial, the absence of a monument, are no necessary signs of want of reverence or affection for those who lie beneath the sod:

" 'Praises on tombs are trifles vainly spent.'
    It may be—
" 'There is an eye that could not brook
   A moment on that grave to look.'
    One who can say:
" 'I will not ask where thou liest now,
   Nor gaze upon the spot;
There flowers or weeds at will may grow
   So I behold them not;
It is enough for me to prove
That what I loved, and long must love,
   Like common earth can rot;
To me there needs no stone to tell;
'Tis nothing that I loved so well' ": 6 Lanc. 302.