First Trinity Evangelical Lutheran Church
Appeal.

186

Argued November 11, 1968. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and HANNUM, JJ.

*William H. Markus,* with him *Charles Covert Arensberg, John P. Papuga, David McN. Olds,* and *Patterson, Crawford, Arensberg & Dunn,* and *Reed, Smith, Shaw & McClay,* for appellant.

*Walter J. Wagner,* with him *R. R. McWhinney, Richard DiSalle* and *Edward M. Elliott,* for appellee.

OPINION BY MONTGOMERY, J., March 20, 1969:

This appeal reaches us from an order of the Quarter Sessions Court of Allegheny County, refusing the petition of appellant, The First Trinity Evangelical Lutheran Church in the City of Pittsburgh (Church)

for authority to abandon its Oakland Cemetery, to remove the remains of bodies of deceased persons buried therein, to reinter said remains in Mount Royal Cemetery, Shaler Township, Allegheny County, Pennsylvania, to reset the tombstones of such persons on their graves when reinterred, and to sell the cemetery by general warranty deed to the University of Pittsburgh.

The petition was answered by the following lot owners: Frederick K. Becker, Lot 26, Section B; Emma Hotchkiss, Lots 597-598, Section I; Anna Mae Petote and Margaret Conte, formerly Margaret Kelly, Lot 341, Section B; Dorothy W. Steinbrink, William F. Steinbrink and Walter H. Steinbrink, Lot Nos. 248, Section B, 373 and 374, Section A; Joseph Walter, Lot 273, Section A; Karl Mertzeis, Lot 25, Section B; Edward M. Elliott, Lot 373, Section B.[1] Other lot owners appeared at the hearing to object but filed no pleadings. Generally, these persons objected to the removal of the remains of their relatives to Mt. Royal Cemetery because it is too far removed from the Oakland Cemetery, making it inconvenient for them and their friends to visit the new burial places of their loved ones; and they seek to have petitioner remove such remains to cemeteries near the present homes of the objectors at the expense of petitioner. However, it was contended by some that petitioner has failed to comply with the provision of the Act of June 25, 1913, P. L. 551, 9 P.S. §47, in not first negotiating with the lot owners for the removal of the remains of their relatives; and one claims a fee simple interest in the soil as a further reason for opposing the petition.

Section I of the Act of 1913 provides a method by which churches, etc., operating cemeteries may, under

---

[1] Only the Steinbrinks and Karl Mertzeis have appeared in this appeal. Their counsels presented oral arguments and letters as a substitute for briefs in which they object only to the selection of Mt. Royal Cemetery as the site for reinterment.

certain conditions, negotiate with lot owners for the removal of the remains of persons buried therein, and for the repurchase of lots therein to accomplish the abandonment of the cemetery and the sale of the property.[2] Section 2 thereof provided for the accomplishment of the same objectives by court procedure without negotiating with the lot owners. However, Section 2 has been repealed and supplanted by Section 2 of the Act of August 11, 1959, P. L. 676, 9 P.S. §48.1, which reads, "The courts of quarter sessions . . . upon petition of the proper officials in whom is vested the management of the affairs of any incorporated or unincorporated church, cemetery or burial association, setting forth any one or more of the following reasons:

"(1) That due to the opening of streets, roads or public passages around or through the same, a portion of the property has become angular and partly surrounded by improvements; or

"(2) That due to the proximity of adjacent property, the interment of the dead may, in the interest of public health, be prohibited in the ground belonging to any such church, cemetery or burial association aforesaid; or

"(3) That from other causes, any burial ground belonging to or in charge of any such incorporated or unincorporated church, cemetery or burial association, has ceased to be used for interments and has become so neglected as to become a public nuisance; or

"(4) That the remains of such bodies interred in any such neglected or disused cemetery in any city, township or borough interfere with and hinder the improvements, extension and general progressive interest of the Commonwealth or any city, borough, town or township; and after three weeks of advertisement of

---

[2] The appellant-Church does not rely on Section I of the 1913 Act to support its petition.

hearing in open court, for the purpose, are hereby vested and empowered with full power and authority, after full hearing of the parties therein, proofs and allegations, for any one or more of the above reasons, to authorize and direct the removal of the remains of all of the dead from the whole or any part of such cemetery or burial ground to another portion of the said cemetery or burial ground or to such other suitable ground as said officials may have procured in the vicinity for the reinterment of the bodies, or to such lots or sections in a properly regulated burial ground in the vicinity, and to order and decree that the ground from which the bodies have been removed shall be forever vacated for burial purposes."[3]

. In order to come to a clear understanding of the problem a review of the history of the cemetery will be helpful.

Petitioner was chartered as The First German Evangelical Lutheran Church in the City of Pittsburgh on June 21, 1841. In 1931 the name was changed to the one under which these proceedings were brought. From the time it was chartered in 1841 the Church was lo-

---

[3] See also Act of May 19, 1923, P. L. 281, §1, 9 P.S. §51: "Whenever any private burial ground by reason of the drilling of oil wells, or the opening of mines or quarries in the vicinity thereof, or from any other cause, has become or shall hereafter become unsightly and an unsuitable place for the repose of the dead, the court of quarter sessions of the county in which such burial ground is situated, on petition of the trustee or trustees having charge thereof, or of any person having a relative buried therein, shall have jurisdiction and power to authorize and direct the removal of the remains of all dead from such private burial ground to such other suitable ground as shall be provided by the petitioner or petitioners for the reinterment of the bodies. Notice of the presentation of a petition for any such order of removal and reinterment shall be given by advertisement, once a week for a period of three (3) weeks, in at least one newspaper of general circulation published in the county, and in such other manner as the court may direct."

cated on Fifth and Sixth Streets in downtown Pittsburgh until 1929, when it was moved to 535 North Neville Street in the Oakland district of the city, where it now conducts its services.

In 1863 the Church purchased six acres of land in Pitt Township, now part of the City of Pittsburgh, which is the site of the present Oakland Cemetery under consideration in this appeal.

This tract was composed of six lots in William Arthurs Farm Plan and was described as together fronting 637 feet, three and one-half inches on Morgan Street, and running back eastwardly along Alaquippa (Allequippa) Street on the south, 565 feet, eight and one-half inches, and on the north along a 25 foot alley (Berthoud Street) 469 feet, eight and one-half inches to line of Jacob Ewart. Shortly thereafter the site was dedicated as a cemetery, plotted into burial lots with roads and passageways through it, and sold by deed undertaking "to grant, bargain, sell and convey" to the purchaser "his heirs and assigns" the described lot, "To have and to hold the hereinabove granted premises to the said [purchaser] his heirs and assigns, subject however, to the conditions and limitations, with the privileges specified in the Rules and Regulations hereto annexed."

During the hundred years from 1863 to 1963 there were over 5,034 burials made in the cemetery, and there are many lots presently held by persons for future burials, and about 165 lots remain unsold. However, there have been no sales of lots made since 1963, and since that year there have been few burials therein, the last two being in 1967.

The cemetery is not, and for some time past has not been, well maintained. The roads within it as well as the entrance are described as "deplorable". The grass is not cut regularly, weeds are in abundance,

many tombstones are sunken or toppled; the sexton's house erected thereon is badly in need of repair, and equipment used for interment purposes is meager and obsolete. Whereas prior to the vacation of Morgan Street it had two entrances from that street and one from above (University Drive), only the University Drive entrance remains. This is a road existing partly on land owned by the University of Pittsburgh. There never was an entrance from Allequippa Street, the land in that area being described as marshy and unsuitable for burials, same being the rear of the cemetery.

The cemetery has been and presently is used by trespassers taking a short cut through it to and from a nearby public housing project, and has been subject to some destruction by vandals.

When the cemetery site was purchased in 1863 it was a hilltop overlooking lower terrain in all directions. It was located four to five miles from downtown Pittsburgh where the Church was then located, whereas it is one-and-one-half to two miles from the present location of the Church. The district in which it was located was then largely undeveloped. To the south it overlooked what was to become an expensive residential and cultural section of the City of Pittsburgh known as Schenley Farms and later Oakland. Such institutions as the University of Pittsburgh, Carnegie Institute of Technology, now Carnegie-Mellon University, Mellon Institute and many others have been established there. In fact the entire Oakland district has been developed into an educational and medical center recognized throughout the world, and is still in the process of development. As part of this center the University of Pittsburgh has expanded its campus to the boundaries of the cemetery under discussion and has buildings, a stadium, and athletic fields on practically all sides of the cemetery. Also the United

States government has constructed a hospital for veterans near it; and a high commercial television tower and station stands immediately adjacent to it.

The City of Pittsburgh has vacated Berthoud and Morgan Streets, two of the abutting streets, leaving the cemetery with but one means of access, University Drive. The cemetery now exists as an island in the sky, 60 to 100 feet above surrounding terrain, supported by retaining walls on two sides and partially on a third, and with protective heavy gauge wire fences erected on the top of them.

The present conditions are due to the actions of the City of Pittsburgh in vacating the streets aforementioned, thereby vesting in the University of Pittsburgh the title to same as an abutting property owner and as a purchaser from the Church for its reversionary interest therein, and the action of the University of Pittsburgh in improving its property. In doing so it excavated close to the cemetery, making it necessary for it to erect the high walls aforementioned to give lateral support to the cemetery property. As the streets existed before their vacation by the city the cemetery property sloped down to the streets, but required no retaining walls.

Initially, we shall dispose of the claim of the one lot owner who says he has a freehold interest in his lot. This has been settled in Pennsylvania as in most other jurisdictions. The purchase of a lot in a cemetery, although under a deed absolute in form and containing words of inheritance, is regarded as conveying only a privilege, easement, or license to make interments in the lot purchased, exclusively of others, so long as the lot remains a cemetery, the fee remaining in the grantor subject to the grantee's right to the exclusive use of the lot for burial purposes. *Pitcairn v. The Homewood Cemetery*, 229 Pa. 18, 77 A. 1105

(1910) ; *Craig v. First Presbyterian Church of Pittsburgh,* 88 Pa. 42 (1879) ; *Kincaid's Appeal,* 66 Pa. 411 (1871) ; *Walter v. Baldwin,* 126 Pa. Superior Ct. 589, 193 A. 146 (1937) ; *Cedar Hill Cemetery Company v. Lees,* 22 Pa. Superior Ct. 405 (1903) ; 14 C.J.S. Cemeteries §25, and is subject to the police powers of the state. *Kincaid's Appeal,* supra; 6 P.L.E., Burial Grounds, §4. In exercising these powers the state may recognize the fact that the interment of dead bodies in the midst of thickly populated districts is likely to prove a menace to the health of the surrounding population and prohibit it. Such enactments are not unconstitutional, either as impairing the obligation of contracts, or taking private property. 5 R.C.L. 239, 240.[4]

Our problem, therefore, is reduced to the question whether the situation at Oakland Cemetery is such as brings it within the purview of either, or both, Section 2 of the Act of 1959, 9 P.S. §48.1, and the Act of 1923, 9 P.S. §51. The lower court held that it did not meet the requirements of Section 2 of the Act of 1959, but did not consider the Act of 1923. The fact that there

---

[4] In *Kincaid's Appeal,* supra, page 421 it is stated, "In Windt v. The German Reformed Church, 4 Sandf. Ch. Rep. 471, it was held that the sepulture of friends and relations in a cemetery belonging to a religious society, confers no right or title upon the survivors, and they cannot prevent the sale of such cemetery by the corporation and the removal of the interred remains, when such removal is in other respects conducted according to law; and in that case the Vice-Chancellor remarked: 'the only protection afforded to the remains of the dead interred in a cemetery of this description, is by the public laws prohibiting their removal, except on the prescribed terms, and in a still stronger public opinion. Probably these furnish all the protection which is consistent with the exigencies of a large city, the population of which increases with marvellous rapidity, and whose wants leave but little room for the remains of the dead in the dense and crowded haunts and thoroughfares of the living.' "

is no serious objection on the part of lot owners to the abandonment of the cemetery, provided the reinterments are at approved sites, is not sufficient to justify the granting of appellant's petition. Statutory authority must support such action. Throughout history burial grounds have been held sacred. At common law they could not be disturbed. *Appeal of Gumbert,* 110 Pa. 496, 1 A. 437 (1885) ; *Brown v. Lutheran Church,* 23 Pa. 495 (1854).

The lower court dismissed the petition, finding no statutory authority to support it, for the following reasons: (a) the property nor a part thereof has not become angular and partly surrounded by improvements; (b) the interest of public health due to the proximity of adjacent property does not prohibit future interments; (c) the cemetery has not ceased to be used for interments; and (d), it has not become so neglected as to be a public nuisance.

We have no difficulty in accepting the findings of Judge SMITH that Oakland Cemetery has not ceased to be a burial place and has not become a public nuisance. Although its future successful operation may involve some uncertainties, such situation has not reached the point of establishing a cessation of operations. Furthermore, in the absence of evidence to establish a situation adversely affecting public health, Judge SMITH's second finding must also be accepted.

However, we cannot accept his finding and conclusion that the cemetery has not become angular and partly surrounded by improvements. As hereinbefore stated, the cemetery has become completely surrounded by improvements made by the University of Pittsburgh, the United States Veterans' Administration, and the commercial television station. As to it, or a portion of it becoming angular by reason of the opening of streets, roads or passages around or through it, the

intention of the Legislature as expressed in Section 2(1) of the Act of 1959 must be determined. The meaning of this provision is not clear, and since it cannot be presumed that the Legislature intended an absurd or unreasonable result, *543 Bar, Inc. Liquor License Case*, 200 Pa. Superior Ct. 360, 188 A. 2d 813 (1963), the section must be given a reasonable interpretation.

So far as our research discloses the language used in the first condition of the 1959 Act, 9 P.S. §48.1, was first used in Section I of the Act of 1913, and has not been passed on by any of our courts although it was referred to *In re Petition of Chester Monthly Meeting of the Religious Society of Friends*, 56 Pa. D. & C. 231 (1946). In that case the court stated, "No change has occurred by reason of improvements or changes in the surroundings."

If we were to accept literally the verbiage of this section, we would be confronted with several glaring conflicts. First, since the Act of April 5, 1849, P. L. 397, §1, 9 P.S. §8, makes it illegal, except in the City and County of Philadelphia, to open a street, lane, alley or public road through any burial ground or cemetery in this Commonwealth, it is difficult to understand why the section under consideration makes mention of an opening of a passage through same. Next we are left with great uncertainty as to what change the Legislature had in mind when a tract already angular becomes angular in part. The tract under consideration was originally and remains generally quadrangular in shape so far as its plane surface is concerned. However, vertically its angles have been materially changed by the vacation and excavation of Berthoud and Morgan Streets.[5] We are also left in

---

[5] Synonyms of angular are cornered, sharp, edgy and abrupt. See Webster's New International Dictionary (Unabridged) 2nd Edition (1953).

doubt as to the meaning of the phrase, ". . . passages around . . . the same". Does this mean such passages immediately adjoining, or does it include also those in the general vicinity of the cemetery?

In order to interpret this provision so as to give effect to all its provisions and to attain the object which we believe the Legislature intended, which we are required to do under the Statutory Construction Act of 1937, P. L. 1019, art. IV, §§51-52, 46 P.S. §§551-552, we would interpret this provision to mean that if by reason of street and road changes in the vicinity of a cemetery improvements are made to properties surrounding it or partially surrounding it, the Court of Quarter Sessions may assume jurisdiction to authorize the removal of the bodies of deceased persons therein to accomplish its abandonment and subsequent sale. Although this provision refers only to street and road openings, we are convinced that the Legislature intended road and street changes generally whether openings, vacations of existing ways or their change of grade. The object of such a provision is, we think, similar to that expressed in the Act of 1923, 9 P.S. §51, supra, which permits such removals, abandonment and sale whenever construction operations, etc., in the vicinity of a cemetery cause it to become an unsightly and unsuitable place for the repose of the dead. As stated *In Re: Hartman Cemetery*, 25 Lehigh L. J. 243 (1953), policy in this area is not dictated by conflicts among the living but respect for the dead.

With a commercial television tower and station erected on a site immediately adjoining this cemetery, an athletic stadium in which at times as many as 60,-000 cheering fans assemble, a large hospital, a public housing development, university buildings accommodating many thousands of persons, etc., surrounding this cemetery, we conclude that this is evidence which

should be considered by the lower court in making a determination whether this cemetery has ceased to be a place where proper reverence and respect for the dead may be shown. If it is unsightly and no longer a suitable place for the repose of the dead the court may, in its discretion, order the removal of the bodies interred therein and the subsequent abandonment and sale of the property in accordance with the statutes aforementioned. See *Re: Removal of Bodies in Burial Ground of Shoop's Lutheran Church*, 73 Dauphin County Reports 1 (1958). This is a private burial ground and may therefore be considered for abandonment under the first provision of the Act of 1959, 9 P.S. §48.1, in the light of the street changes and adjoining improvements, or under the Act of 1923 which refers to oil fields, mines, quarries and dikes as in, *In Re: Hartman Cemetery*, supra, or in view of the high retaining walls constructed by the University of Pittsburgh and the television tower adjoining it. The lower court seemed impressed by the fact that some of the conditions now affecting this cemetery were due to the actions of the University of Pittsburgh. We do not think this should have influenced the lower court's opinion. The City of Pittsburgh had a valid right to vacate the streets and the University and other property owners had a valid right to improve their properties in any manner they saw fit. They did so without trespassing on petitioner's property and the University provided the lateral support of the cemetery it was required to do under the law.

We conclude that the order of the lower court must be reversed and the case remanded for further consideration in accordance with this opinion.

Although the lower court considered the matter of a suitable site for reinterment, i.e., Mt. Royal Cemetery, we shall not pass on this issue in this appeal. The

decision of the lower court was limited solely to the question of whether Oakland Cemetery should be abandoned and the remains of persons buried there removed. The Act of 1959, 9 P.S. §48.1, provides several alternatives for the transfer of the remains of the buried persons, as does the Act of 1923, 9 P.S. §51. Until the lower court first resolves the issue of abandonment in accordance with this opinion, and thereafter determines the issue of where interment should take place, and orders the removal of the remains therein, there is no basis for a decision by this Court on this issue.

Order reversed with a procedendo in accordance with this opinion.