**Pennsylvania Manufacturers' Association Insurance Company v. Wolfe**

*Dennis J. Bonetti,* for plaintiff.
*Richard C. Angino,* for defendants.

DOWLING, *J.*, January 21, 1988—This case of first impression involves a clash between an insurance carrier's right of subrogation under section 319 of the Pennsylvania Workmen's Compensation Act[1] and an attorney's contractual right to a contingency fee when the underlying third-party tort action is resolved on a structured basis and the front money at the time of settlement is insufficient to satisfy both claims.

The event which spawned this litigation occurred on December 19, 1981, when Ronald Wolfe, a defendant herein, was injured while making a delivery of soda on behalf of his employer, Allegheny Beverage Company, to Weis Markets in Lemoyne, Pa. As Mr. Wolfe was unloading a case of soda, he slipped on a patch of ice and fell to the ground, severely injuring his left knee. Plaintiff, Pennsylvania Manufacturers' Insurance Company began paying weekly disability benefits of $262 on December 27, 1981, and continued to pay that amount, plus medical expenses, until February 1986. To date, Mr. Wolfe has been unable to return to work.

---

1. Act of June 2, 1915, P.L. 736, art 3, §319, as amended, 77 P.S. §671.

On October 25, 1982, Mr. Wolfe and his wife Rose, engaged the law firm of Benjamin and Angino, P.C., (the predecessor of Angino and Rovner, hereafter Angino) to represent them in a negligence action against Weis Markets. A contingency fee agreement was signed in which Angino would be entitled to 40 percent of the recovery if suit was filed. On November 17, 1983, suit was filed after which settlement negotiations ensued. Meanwhile, PMA had given notice of its subrogation claim to Angino by letter dated November 1, 1982. Since that time PMA has persisted in enforcing its right to the full amount of the subrogation claim in the action between the Wolfes and Weis Markets. However, because PMA insisted on obtaining its full claim, Weis Markets and its carrier, Home Insurance Company, refused to enter into a settlement unless and until PMA agreed. Settlement negotiations centered around the now-popular "structured" settlement, which provides for an initial lump-sum payment, monthly payments and/or balloon payments. As is often the case, the lump-sum payment was to be equivalent to the attorney's fees based on the present value of the settlement.

To resolve their differences, PMA drafted an escrow agreement which Angino executed on June 25, 1985. In the agreement, the parties state their respective positions with regard to the priority of their claims and agree to litigate that issue in court. The sum of $55,000[2] was placed into an interest-

---

2. The $55,000 figure was arrived at by rounding off PMA's then total lien of $87,468.81 to $90,000 and subtracting PMA's proportionate share of the attorney's fees (40 percent of $90,000 or $36,000) and expenses. This money is derived from the initial lump-sum payment; it is merely coincidental that it is exactly one-half of the lump-sum payment.

bearing escrow account with Richard Angino acting as escrow agent. That money and the accrued interest is to be distributed to the prevailing party in the instant action.

Thereafter, on August 2, 1985, the Wolfes and Weis Markets entered into a settlement agreement which provided for an initial lump-sum payment of $110,000, payments of $1,250.00 per month for life with a 20-year guarantee and additional balloon payments every five years of $10,000, $20,000, $30,000, $40,000 and $50,000, respectively. The parties agree in the escrow agreement that the present value of the settlement is $275,000. Thus, $110,000 represents Angino's 40 percent contingency fee.

PMA filed suit on September 20, 1985, against the above-captioned defendants alleging three counts for recovery of the full amount of the subrogation lien: (1) a statutory right based on section 319 of the act, (2) a contractual right based on an alleged attorney-client relationship between PMA and Angino, and (3) negligent legal representation. Present before the court are cross-motions[3] for summary judgment as to all three counts. As to counts two and three, we will grant defendants' motion for the reasons that follow.

PMA argues that an attorney-client relationship was created by virtue of an exchange of two letters between itself and Angino. We need not decide this issue because we hold that PMA waived its claims

_____

3. By an apparent oversight, defendant's motion is not in the prothonotary's file, nor has it been entered on the docket. Nevertheless, the same legal arguments were advanced in their motion for judgment on the pleadings and in their brief in support of their motion for summary judgment. We therefore deem it filed.

under counts two and three by entering into the escrow agreement of June 25, 1985. That agreement was made for the specific purpose of obtaining a settlement in the Wolfes negligence action, and it embodies the outer limits of the parties' rights and liabilities with respect to the priority of their claims. The agreement so states:

"Whereas, a dispute has arisen between Angino and PMA as to PMA's entitlement to recover its subrogation lien from the initial lump-sum payment of $110,000. It is PMA's position that it is entitled to recover the its [sic] subrogation interest from the initial lump-sum payment to the extent of 60 percent of PMA's total workmen's compensation lien existing at the time of this Agreement and which would recognize a 40 percent attorney's fee payable to Angino for professional services rendered in connection with developing the settlement fund."

PMA mounts a two-fold attack on defendants' waiver theory. First, PMA argues that Angino failed to plead the defense as "new matter," and second, they are not bound by the above-quoted "whereas" clause because it is only a recital clause, and as such, it does not control the operative provisions of the agreement. We must reject these contentions. Although defendants did not expressly plead "waiver," the defense of the escrow agreement permeates their answer, new matter and counterclaim. The purpose of pleading is to provide notice of claims and defenses. Plaintiff was not surprised or led astray by defendants' theory, and, in fact, has countered this argument throughout this litigation.

PMA urges that the escrow agreement merely provided security for their lien and that it has no effect on counts two and three of the complaint. While it is true that the operative provisions of a contract control where there is an ambiguity, here

there is no ambiguity between the operative provisions and the recital provisions. We must keep in mind that our function is to ascertain the intent of the parties, and we are not required to do so in a vacuum. The court may properly consider the nature and character of the transaction and the facts and circumstances which gave rise to its execution. *Walter v. Baldwin,* 126 Pa. Super. 589, 193 Atl.146 (1937). Here, PMA knew well that if it had not consented to the settlement, in all probability the Wolfes and Weis Markets would have proceeded to trial and that a defense verdict was quite possible. PMA would thus have recouped nothing on its lien. Consent to settlement was its only realistic alternative.

The recitals in the agreement do not contradict the operative provisions. Indeed, the operative provisions only govern the mechanics of how the funds are to be accounted for and distributed. It is the recitals, however, and the factual background of this litigation that provide the meaning to which this court must give effect. *Kefover v. Potter Title and Trust Company,* 320 Pa. 51, 181 Atl. 771 (1935).

Nowhere in the recitals does PMA allege or attempt to preserve its breach-of-contract claim. PMA, which drafted the agreement, was content to pursue the funds on the basis of its statutory entitlement. In fact, PMA recognized its obligation to pay its proportionate share of attorney's fees in accordance with the law. This is in direct contradiction with the complaint, which alleges that they do not owe them. To ignore the recitals would be to render their insertion an exercise in futility. The long and short of this entire litigation is a legal question as to which party has priority to the sum of $55,000 which is now in escrow. We now address that question.

Section 319 of the act provides in pertinent part as follows:

"Where the compensable injury is caused in whole or in part by the act or omission of a third party, the employer shall be subrogated to the right of the employe, his personal representative, his estate or his dependents, against such third party to the extent of the compensation payable under this article by the employer; reasonable attorney's fees and other proper disbursements incurred in obtaining a recovery or in effecting a compromise settlement shall be prorated between the employer and employe, his personal representative, his estate or his dependents. The employer shall pay that portion of the attorney's fees and other proper disbursements that the amount of compensation paid or payable at the time of recovery or settlement bears to the total recovery or settlement. Any recovery against such third person in excess of the compensation theretofore paid by the employer shall be paid forthwith to the employe, his personal representative, his estate or his dependents, and shall be treated as an advance payment by the employer on account of any future installments of compensation." (footnote omitted).

Angino maintains that he has a first claim to the initial lump-sum payment which supersedes PMA's statutory right. We disagree. In *Rollins Outdoor Advertising v. W.C.A.B.*, 506 Pa. 592, 487 A.2d 794 (1985), in discussing an employer's accrued subrogation lien, the court declared unequivocally that compensation paid by the employer "constitutes a claim against the recovery, payable *immediately* upon recovery to the employer." Id. at 487 A.2d at 796 (emphasis added). Here, the lump-sum payment of $110,000 is insufficient to pay both claims. Thus, Angino argues that PMA must recoup its

claim by suspending future compensation payments. This same argument was presented by the employe in Rollins and was rejected by the court:

"Secondly, it ignores the value to an employer of receipt of the entire subrogation amount in a lump sum at the earliest possible time. Lastly it ignores the possibility that, had the employee's disability terminated within six years of settlement, the employer would have lost his claim to the full, accrued subrogation amount." Id. at 487 A.2d at 797.

The only material difference between Rollins and the instant case is that in Rollins the employee received a lump-sum settlement; here the settlement is structured and the initial lump-sum payment was purposely calculated to cover only the attorney fees. Thus, the question of priorities was not presented. We note that in a lump-sum settlement, the priorities question will not arise because funds are immediately available to satisfy the lien. Here, the question is one of timing, i.e., *when* is the carrier entitled to recoup the lien.

We conclude that the reasoning of Rollins controls the instant case. To be sure, we recognize that were it not for counsel's efforts, PMA would recoup nothing. For their efforts, counsel is entitled to their fee. However, it must also be recognized that before Angino ever agreed to represent the Wolfes, PMA had an unflagging statutory obligation to pay benefits for any work-related injury. In return for this obligation, PMA has a statutory entitlement to a first claim on the settlement proceeds.[4]

It is important to stress that although the parties may characterize this case as a contest between the carrier and the employee's attorney, legally speaking, it is between the carrier and the employee. Sec-

4. Accord, 101 C.J.S. §1042.

tion 671 so states, "[T]he employer shall be subrogated to the right of the *employee. . . .*" (emphasis added). Indeed, in this situation, under the Federal Rules of Civil Procedure, the carrier is the real party in interest in the third-party action. *Lucas v. Durabond Products Co.,* 510 F.Supp. 999 (1981). Regardless of the arrangement between the employee and his counsel, the settlement obtained was and always is subject to the carrier's lien until paid.[5] How and when plaintiffs' attorney's fees are to be paid is a contractual matter within the province of the contracting parties. But this is not to say that they may circumvent the employer's claim which has a statutory basis. The carrier is out-of-pocket a certain sum of money, and they are legally entitled to reimbursement the moment the underlying action is settled. Under defendants' theory, not only would it ignore the time value of money which was recognized in Rollins, but it would also be contrary to the rationale for subrogation because there is no assurance that the carrier would recoup the total lien.

"That subrogation is an equitable right to compel the ultimate discharge of an obligation by the party who ought, in good conscience, to pay it, is a well settled tenet of Pennsylvania law." *Appeal of Miller,* 119 Pa. 620, 13 Atl. 504 (1888). As an equitable entitlement founded on principles of reason and justice, subrogation is to be given liberal application

---

5. Angino also argues that PMA must prove negligence on the part of Weis Markets in order to recover its lien. This argument has been twice rejected. *Trumbull v. Paris Linen & Decorating Shops Inc.,* 249 Pa.Super. 629, 377 A.2d 1004 (1977); *Heiser v. W.C.A.B.* (Westmoreland Cas. Co.)., 95 Pa. Commw. 350, 505 A.2d 1060 (1986). We note also that in Rollins, supra, the employee's recovery was by way of settlement, yet the employer was allowed subrogation.

and construed to yield a reasonable result." *Heiser v. W.C.A.B.*, 95 Pa. Commw. 350, 505 A.2d 1060, 1063 (1986); quoting Takiff, J., *Trumball v. Paris Linen & Decorating Shops Inc.*, Court of Common Pleas of Philadelphia County (No. 437 July Term 1977) affirmed per curiam, 249 Pa.Super. 629, 377 A.2d 1004 (1977).

Our ruling also comports with public policy. Not only does it ensure that the carrier is not penalized for the faults of others, but it also makes certain that it will recoup its lien, thus lowering insurance costs in the long run. It also fulfills a primary objective of subrogation, in that it assures that a double recovery by the employee will not occur. *Dale Manufacturing Co., v. Bressi,* 491 Pa. 493, 421 A.2d 653, 654 (1980). Lastly, under defendants' theory, Mr. Wolfe would in effect repay the carrier by not returning to work. No court should sanction a rule which creates such a deterrent to work.

Since PMA is entitled to immediate reimbursement of its lien, it must also pay the proportionate share of attorney's fees and expenses incurred in obtaining the recovery. Section 319, supra. Here, Angino charged a 40 percent contingency fee. Thus, PMA's lien must be reduced by 40 percent.

PMA argues that the lien is $93,682 by virtue of a finding by Referee Deeley of the Bureau of Workers' Compensation, dated October 16, 1986. Angino admits that the lien is at least $87,000 (see deposition of Richard C. Angino), but contends that he is not bound by the referee's finding because it was not formally enumerated as a "finding of fact" and in any event, collateral estoppel does not apply between tribunals of differing subject-matter jurisdiction and because he was not a party before the referee. Again, we must disagree.

Although Referee Deeley did not include this in his findings, there can be no doubt that he found it as a fact. In a separate paragraph of his "discussion of findings and conclusions," Deeley states, "Defendants have paid $93,682.81 in compensation to date with $56,666.85 of that being weekly payments and the remainder medical payments." We thus reject defendants' technical argument. Moreover, the computer printout of the payments made to Mr. Wolfe which were submitted at the hearing and in exhibit D of plaintiff's statement of material facts has not been challenged in any way.

Collateral estoppel must be given effect where the party against whom it is asserted had a "full and fair opportunity to litigate the issue in question." *Estate of Ellis III*, 460 Pa. 281, 287, 333 A.2d 728 (1975). Mr. Wolfe was obviously a party in the proceedings before the referee. Additionally, an associate from Angino's office was present. Thus, both defendants had an opportunity to dispute the amount of the lien, which was one of the principal issues. The argument concerning subject-matter jurisdiction is erroneous because the referee's jurisdiction was plenary with respect to the amount of the lien.

PMA is entitled to 60 percent of its total lien of $93,682.81 or $56,209.69. However, because the parties agreed to litigate only the sum of $55,000 and accrued interest which is not in escrow, judgment is granted in favor of PMA as to the escrowed funds. We note that in a normal case, PMA's lien would be further reduced by a proportionate share of the expenses incurred in obtaining the recovery.

Accordingly, we enter the following

ORDER

And now, this January 21, 1988, defendants' motion for summary judgment as to counts two and

three of plaintiff's complaint is granted; plaintiff's motion for summary judgment as to count one is granted; and defendants are directed to release the amount in escrow to PMA.